UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
FUSIONMEDIA Ventures, LLC,

                           *Plaintiff,*

         - *against* -

Sportority Inc. d/b/a Minute Media,

                       *Defendant.*
-----------------------------------------------------------------X

Case No.:

**COMPLAINT**

Jury Trial Demanded

FUSIONMEDIA Ventures, LLC d/b/a Beusse and Frank, LLC ("Plaintiff"), by its undersigned attorneys, as and for its complaint against Defendant Sportority Inc. d/b/a Minute Media ("Defendant"), complains as follows:

## PRELIMINARY STATEMENT

1. This action arises from Defendant's bad-faith scheme to solicit, obtain, and exploit Plaintiff's proprietary business strategies, confidential information, and industry relationships relating to the development of a Free Ad-Supported Streaming Television ("FAST") Sports-Illustated branded platform.

2. The allegations in this Complaint are not made lightly. Plaintiff is comprised of two highly experienced media and entertainment executives, each of whom has spent decades operating at the highest levels of the industry, including serving in senior leadership roles at nationally recognized media companies, digital platforms, and content businesses.

3. In 2024, Plaintiff initially approached Defendant to obtain a license to develop a Sports Illustrated FAST platform independently based on the Defendant's control over Sports Illustrated branded media content.  Plaintiff devoted more than a year to developing the FAST platform at issue – investing substantial time, effort, and specialized industry knowledge to create

1

a comprehensive and commercially viable business strategy. This work included the development of a detailed programming architecture, a multi-platform distribution model across FAST and connected-TV ecosystems, a monetization framework tied to advertising and audience engagement, and a strategic roadmap for partnerships, content acquisition, and platform growth. The resulting materials were not theoretical concepts, but a fully realized, execution-ready blueprint grounded in Plaintiff's decades of industry experience and relationships.

4.    Although Plaintiff initially approached Defendant to explore a standalone licensing arrangement, the parties' discussions pivoted into a potential joint venture. In furtherance of that collaboration, the parties entered into a Mutual Non-Disclosure Agreement to enable the sharing of confidential information, subsequently executed a Letter of Intent setting forth the preliminary terms of their proposed partnership. Defendant never reached a final agreement with Plaintiff after more than fifteen (15) months of negotiations because, having obtained and absorbed Plaintiff's proprietary work, they elected to appropriate that work and proceed independently to develop and launch a substantially similar platform for their own benefit.

5.    Plaintiff's work was not a collection of generalized industry concepts. It was a comprehensive and integrated blueprint for a capital-efficient, brand-led streaming platform – combining a specific programming architecture, a multi-platform distribution strategy, a monetization framework tied to advertising and engagement, and an operational model leveraging existing assets and technology. These materials reflected months of development and embodied Plaintiff's proprietary approach to entering and competing in the rapidly evolving FAST market.

6.    Rather than proceed in good faith toward a partnership, Defendant used Plaintiff's confidential information to accelerate their own efforts. After the parties' discussions ended

without a definitive agreement, Defendant proceeded to develop and launch a FAST Platform that mirrors the core elements of Plaintiff's work – including its hybrid programming model, its reliance on archival content and editorial assets, its broad distribution across FAST platforms, and its integration of engagement-driven and betting-related content.

7.    Defendant's conduct was not coincidental, nor was it the product of independent development. It reflects the unauthorized use of Plaintiff's proprietary information in direct violation of the parties' non-disclosure agreement and in contravention of federal and state law protecting trade secrets and confidential business information.

8.    In furtherance of the parties' contemplated joint venture, Plaintiff provided Defendant with a series of detailed presentations, written materials, and strategic work product that collectively set forth a comprehensive blueprint for the proposed FAST Platform. These materials included executive-level presentations, investor-ready decks, and supporting memoranda that outlined, in granular detail, the concept, structure, and execution plan for launching and scaling a Sports Illustrated-branded streaming television business.

9.    Defendant induced Plaintiff to disclose detailed non-public information by repeatedly representing – through meetings, calls, and written communications – that Plaintiff would serve as a partner, operator, and equity participant in a Sports Illustrated-branded streaming venture.

10.    The conduct at issue occurred over a period of approximately fifteen (15) months, during which the parties entered into a Non-Disclosure Agreement and exchanged multiple drafts of a Letter of Intent in furtherance of forming a joint venture. Throughout this period, the parties engaged in extensive communications, including the exchange of over 500 emails, and Plaintiff performed substantial work in connection with the contemplated venture.

11.    After obtaining Plaintiff's confidential materials, Defendant proceeded – without authorization and without any agreement with Plaintiff – to develop and launch their own Sports Illustrated-branded FAST platform. The platform Defendant ultimately brought to market closely mirrors the structure, strategy, and execution framework that Plaintiff had previously presented, including the same integrated approach to content, distribution, monetization, and operations.

12.    Specifically, Defendant's platform reflects Plaintiff's hybrid programming architecture, combining editorial talent-driven shows, original and documentary content, archive-based "vault" programming, and selective tier-2 live sports – precisely the content mix and capital-efficient model Plaintiff outlined in its presentations. Defendant likewise adopted Plaintiff's archive monetization strategy, prominently featuring repurposed legacy Sports Illustrated content as a core programming pillar, and implemented a broad, non-exclusive distribution model across multiple FAST platforms and connected-TV ecosystems, consistent with Plaintiff's detailed distribution plan designed to rapidly scale audience reach and advertising inventory.

13.    Defendant further incorporated Plaintiff's monetization and engagement framework, including the integration of betting-related content and audience engagement features as drivers of viewership and revenue, and relied on the same internal asset-leveraging model Plaintiff proposed – utilizing existing editorial content, talent, and video infrastructure rather than building a platform dependent on costly premium sports rights. The result is a platform that reflects not just general industry trends, but the specific combination, sequencing, and integration of strategic elements uniquely developed by Plaintiff and disclosed to Defendant in confidence.

14.    The substantial similarity between Plaintiff's confidential work product and Defendant's launched platform is not coincidental. It is the direct result of Defendant's use of

Plaintiff's proprietary materials to shortcut the development process and bring a competing platform to market – without compensating Plaintiff and in violation of their contractual and legal obligations.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

16.    The trade secrets at issue relate to products and services used in, or intended for use in, interstate commerce, including digital streaming platforms, advertising markets, and multi-state distribution channels, thereby satisfying the jurisdictional requirements of the Defend Trade Secrets Act.

17.    This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendant resides in this District and maintains their principal place of business here.

## THE PARTIES

19.    At all times relevant herein, the Plaintiff is and continues to be a limited liability company duly organized under the laws of the State of Connecticut.  Plaintiff is a dual member limited liability company whose members are both citizens of the State of Connecticut.

20.    Tom Beusse is a seasoned senior executive in the sports media industry with decades of experience leading major multi-platform media organizations, including USA Today

Sports, Sports Illustrated, and Westwood One. He has served as CEO of multiple media companies, secured significant private equity funding, and is a pioneer in FAST channel development, including launching the World Surf League's streaming platform and advising on emerging sports streaming initiatives.

21. Neal Frank is an accomplished media and ad-tech executive with extensive experience building and scaling digital media ventures. He has founded and led multiple successful companies, including The Marlin Entertainment Group and The Design Network, a leading FAST channel, and has held senior roles developing innovative monetization and ad-tech solutions, including managing over $100 million in invested capital and contributing to the global expansion of MTV.

22. At all relevant times, the Plaintiff maintained a principal place of business in the State of Connecticut.

23. At all times relevant herein, Defendant Sportority Inc. d/b/a Minute Media is a Delaware corporation with its principal place of business in New York, New York.

## FACTUAL ALLEGATIONS

### A. Timeline of the Parties' Business Relationship

24. Plaintiff developed a proprietary FAST platform strategy, including: (a) a specific programming mix (live sports, programming, original content); (b) monetization models (direct sales, programmatic, sponsorship bundling); (c) investor pipeline and capital formation strategy; (d) content acquisition and licensing framework;(e) distribution strategy across connected TV platforms; and (f) ad-tech integration and engagement models. This information was confidential, non-public, and commercially valuable.

25. Plaintiff initially approached Defendant, in 2024, in an effort to obtain a content

license independently for Defendant's Sports Illustrated related content, without any partnership.

26.     Thereafter, the parties pivoted to discussions of a potential collaboration, executed a non-disclosure agreement and letter of intent, and engaged in extensive exchanges of confidential information – only for Defendant to ultimately misappropriate Plaintiff's work.

27.     On May 1, 2024, Plaintiff and Defendant entered into a Mutual Non-Disclosure Agreement (the "NDA") that stated that the parties contemplated a jointly owned venture to operate the FAST-programming service.

28.     Between May 2024 and August 2024, Plaintiff disclosed proprietary business concepts, including: (a) a FAST-sports programming framework; (b) a content mix strategy focused on live sports, (d) programming, (e) emerging sports; and (f) interactive engagement features and platform innovations.

29.     In August 2024, Plaintiff and Defendant progressed their business relationship toward negotiating and structuring a joint venture agreement for the development and operation of the Fast-programming service through a Letter of Intent (the "LOI").

30.     From mid-2024 through late 2024, Plaintiff continued to provide Defendant with confidential proprietary strategies, including: (a) programming strategies and content pipelines; (b) platform architecture and monetization concepts; and (c) strategic partnerships and market positioning.

31.     Plaintiff disclosed such information in reliance on the NDA and the parties' ongoing collaboration toward a joint venture.

32.     Despite ongoing discussions for a joint venture, the parties never executed a definitive joint venture agreement.

33.     Defendant, however, continued to develop a FAST platform initiative following

7

the breakdown of the parties' relationship.

34.     On or about July 10, 2025, Plaintiff, through counsel, notified Defendant of its breaches of the NDA and related misconduct.

**B.  Defendant's Misconduct**

35.     Defendant breached the NDA, misappropriated confidential information, and were unjustly enriched by inducing Plaintiff to share proprietary information through false representations of a partnership, then using that information to develop the FAST-programming service without Plaintiff.

36.     Before and after entering into the NDA, Defendant deliberately made material misrepresentations to induce Plaintiff to disclose its Confidential Information (as defined in the NDA), including falsely representing on multiple occasions that the parties were, and would be, partners in connection with the FAST-programming service.

37.     Although the LOI was not ultimately executed, it reflects the parties' mutual understanding, course of dealing, and agreement in principle to form a joint venture to develop and operate a Sports Illustrated-branded FAST streaming platform.

38.     Under the terms of the LOI, the parties agreed to collaborate in good faith toward a definitive joint venture agreement, including jointly developing an investor presentation, raising capital, and structuring the business, with defined roles for each party, including Plaintiff's responsibility for operations and capital formation and Defendant's contribution of intellectual property and platform assets.

39.     In addition, the LOI expressly contemplated an exclusive negotiation period, pursuant to which the parties agreed to negotiate solely with one another in good faith with respect to the development of the venture and not to pursue competing arrangements during that period.

40.     Further, the LOI included binding provisions governing, *inter alia*, confidentiality, non-circumvention, and exclusivity, which were intended to protect the parties' respective contributions, proprietary information, and business opportunity during the negotiation and development process.

41.     Based on the parties' extensive negotiations, mutual commitments, and course of performance – including the exchange of proprietary materials, development of joint business plans, and collaboration on fundraising and strategy – the parties entered into a binding preliminary agreement requiring good-faith negotiations under New York law.

42.     Defendant breached their obligations by using the negotiation process to extract Plaintiff's proprietary information, failing to negotiate in good faith, violating exclusivity by pursuing the same business independently, exploiting Plaintiff's work and relationships, and terminating discussions after capturing the value of Plaintiff's efforts.

### C.  Defendant's Misappropriation of Plaintiff's Work

43.     Defendant misappropriated Plaintiff's proprietary business concepts, strategic frameworks, and non-public operational methodologies developed in connection with the parties' contemplated FAST platform.

44.     Plaintiff's work was not limited to generalized industry ideas, but instead reflected a specific and differentiated architecture for launching and scaling a Sports Illustrated-branded streaming television platform, including the integration of content, distribution, monetization, and technology into a unified model.

45.     Plaintiff developed and disclosed a brand-led FAST platform strategy that extended the Sports Illustrated franchise beyond traditional publishing into a comprehensive streaming ecosystem combining live sports, editorial programming, archival content, and

interactive features.

46. Defendant subsequently launched a FAST channel that mirrors this same core concept – namely, a 24/7 Sports Illustrated-branded streaming platform built around original programming, live events, lifestyle content, and archival footage – reflecting direct adoption of Plaintiff's strategic vision.

47. Defendant further misappropriated Plaintiff's content strategy and programming architecture, which called for a hybrid model combining: (i) editorial talent-driven programming, (ii) original and documentary content, (iii) archival "vault" monetization, and (iv) selective tier-2 and tier-3 live sports rights as a capital-efficient alternative to premium league rights.

48. The FAST channel ultimately launched by Defendant follows this same multi-layered programming structure, including the use of editorial franchises, archive-based programming, and limited live sports inventory, demonstrating substantial overlap with Plaintiff's proprietary framework.

49. In addition, Defendant appropriated Plaintiff's distribution strategy, which emphasized rapid audience aggregation through broad, non-exclusive distribution across multiple FAST platforms, smart-TV ecosystems, rather than reliance on a single destination platform.

50. Consistent with Plaintiff's model, Defendant launched the channel across numerous third-party streaming platforms and aggregators, including several identical or functionally equivalent distribution partners, thereby implementing the same layered distribution architecture developed and disclosed by Plaintiff.

51. Defendant also misused Plaintiff's monetization and engagement framework, which incorporated sports betting content, interactive features, and data-driven engagement tools as key drivers of audience growth and advertising revenue. The publicly available version of

Defendant's platform similarly integrates betting-related content and engagement-driven programming, reflecting further alignment with Plaintiff's proprietary strategy.

52.    Critically, Plaintiff's work emphasized leveraging existing internal assets – such as editorial talent, content libraries, and technology infrastructure – to build a capital-efficient FAST platform. Defendant's ultimate implementation adopts this same approach, relying heavily on Sports Illustrated editorial content, archives, and Minute Media's existing technology stack, rather than developing a platform from first principles.

53.    The overlap between Plaintiff's work product and Defendant's launched platform is not incidental or limited to generalized industry trends. Rather, it reflects the specific combination, sequencing, and integration of strategic elements uniquely developed by Plaintiff and disclosed to Defendant under the protection of the parties' non-disclosure agreement. Defendant's use of these elements to develop and launch their FAST platform constitutes misappropriation of Plaintiff's confidential and proprietary information.

### AS AND FOR A FIRST CAUSE OF ACTION
#### (Breach of Contract - NDA)

54.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

55.    The NDA constitutes a valid and enforceable contract between Plaintiff and Defendant.

56.    Under the NDA, Defendant agreed, *inter alia*, to maintain the confidentiality of Plaintiff's Confidential Information, to use such information solely for the limited purpose of evaluating a potential business transaction between the parties, and not to disclose or use such information for any other purpose.

57.    Plaintiff fully performed its obligations under the NDA, including by disclosing

Confidential Information to Defendant in reliance on Defendant's contractual commitments and by otherwise complying with all conditions precedent.

58.     Defendant materially breached the NDA by, among other things, using Plaintiff's Confidential Information for purposes beyond evaluating a potential transaction, including: to develop, advance, and/or commercialize a competing FAST streaming platform; incorporating Plaintiff's proprietary business strategies, programming frameworks, monetization models, and industry relationships into their own business activities; disclosing or leveraging such Confidential Information outside the limited "need-to-know" scope permitted by the NDA; and failing to maintain such information in strict confidence as required by the NDA.

59.     As a direct and proximate result of Defendant's breaches, Plaintiff has suffered substantial damages, including but not limited to the loss of business opportunities, loss of the benefit of its proprietary information, competitive harm, and unjust enrichment to Defendant, in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract – Type II Preliminary Agreement)

60.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

61.     The LOI, together with the parties' course of conduct, communications, and performance, constitutes a binding preliminary agreement under New York law obligating the parties to negotiate in good faith toward a definitive joint venture agreement.

62.     Although certain provisions of the LOI were expressly non-binding, the LOI reflects the parties' mutual commitment to pursue a joint venture to develop and operate a Sports Illustrated-branded FAST streaming platform, including agreed-upon framework terms concerning structure, roles, capital formation, intellectual property contributions, and governance.

63.    Under New York law, a Type II agreement is a recognized category of preliminary agreement in which the parties have not yet reached a final, binding contract on all material terms, but have nevertheless agreed to negotiate in good faith toward a definitive agreement.

64.    The existence of a Type II agreement is further evidenced by: (i) the parties' detailed negotiations over a defined transaction; (ii) the exchange of proprietary materials and business plans; (iii) Plaintiff's performance, including providing Confidential Information, strategic guidance, and investor introductions; and (iv) the parties' agreement to collaborate on fundraising and development of an investor presentation.

65.    Under this preliminary agreement, Defendant was obligated to negotiate open terms in good faith, to refrain from acting in a manner inconsistent with the agreed framework, and not to use the negotiation process as a means to appropriate Plaintiff's work or to deprive Plaintiff of the benefits of the contemplated transaction.

66.    Plaintiff fully performed its obligations under the LOI and the parties' preliminary agreement, including by engaging in good-faith negotiations, contributing substantial time and resources, developing joint materials, and disclosing proprietary information in furtherance of the contemplated joint venture.

67.    Defendant breached its obligation to negotiate in good faith by, among other things, using the LOI and related negotiations as a pretext to extract Plaintiff's proprietary information, failing to meaningfully negotiate toward a definitive agreement, violating the exclusivity and non-circumvention obligations by independently pursuing the same or a substantially similar business opportunity, exploiting Plaintiff's work product and relationships, and terminating negotiations after obtaining the benefit of Plaintiff's efforts while continuing to pursue the opportunity for themselves.

68.    Defendant's conduct was inconsistent with the parties' agreed framework and evinced a lack of intent to reach a final agreement, thereby frustrating the purpose of the LOI and depriving Plaintiff of the opportunity to participate in the contemplated joint venture.

69.    As a direct and proximate result of Defendant's breach of their obligation to negotiate in good faith, Plaintiff has suffered damages, including but not limited to out-of-pocket costs, lost business opportunities, loss of the benefit of its proprietary work, and unjust enrichment to Defendant, in an amount to be determined at trial.

### AS AND FOR A THIRD  CAUSE OF ACTION
### (Promissory Estoppel)

70.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

71.    Defendant made clear and unambiguous promises to Plaintiff that the parties would enter into a joint venture to develop and operate a Sports Illustrated-branded FAST streaming platform, and that Plaintiff would serve as a partner, operator, and equity participant in that venture. These promises were made repeatedly, during the course of negotiations, including in meetings, calls, written communications, and draft deal documents, and were intended to induce Plaintiff's participation and disclosure of proprietary information.

72.    Defendant's' promises were reasonably expected to induce reliance by Plaintiff, and Defendant knew or should have known that Plaintiff would rely on those promises by devoting substantial time, resources, and expertise to the development of the contemplated venture, including preparing business plans, developing programming and monetization strategies, and making introductions to investors and industry partners.

73.    Plaintiff did, in fact, reasonably and foreseeably rely on Defendant's promises by, among other things, expending significant time and resources over an extended period, disclosing

14

valuable Confidential Information, developing joint materials, and foregoing other business opportunities in order to advance the contemplated joint venture with Defendant.

74. Defendant failed to honor its promises and instead used the negotiation process as a pretext to obtain Plaintiff's proprietary information and business insights, after which Defendant terminated negotiations and proceeded to develop and pursue the same or a substantially similar opportunity without Plaintiff.

75. As a direct and proximate result of Defendant's failure to honor their promises, Plaintiff has suffered substantial injury, including but not limited to out-of-pocket costs, loss of business opportunities, loss of the value of its proprietary work and information, and unjust enrichment to Defendant, in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Misappropriation of Trade Secrets – Defend Trade Secrets Act, 18 U.S.C. § 1836)**

76. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

77. Plaintiff developed and owned valuable trade secrets within the meaning of the Defend Trade Secrets Act, including specific, non-public, and proprietary information relating to the development and operation of a FAST streaming platform (the "Trade Secrets").

78. The Trade Secrets include, without limitation: (i) detailed programming strategies, including specific content mix and scheduling frameworks; (ii) proprietary monetization models, including structured advertising, sponsorship, and revenue optimization strategies; (iii) a curated investor pipeline and capital formation strategy; (iv) identified business relationships and introductions to potential partners, distributors, and advertisers; (v) strategic plans for platform development, launch, and distribution across connected TV ecosystems; and (vi) integrated business models combining content, advertising, and audience engagement.

79.     The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by, other persons or entities who could obtain economic value from their disclosure or use. The information reflects Plaintiff's substantial time, effort, expertise, and industry experience, and provides a competitive advantage in the rapidly evolving FAST streaming market.

80.     Plaintiff took reasonable measures to maintain the secrecy of its Trade Secrets, including, *inter alia*, entering into the NDA with Defendant, limiting disclosure of such information to confidential settings, restricting dissemination on a need-to-know basis, and treating such information as confidential and proprietary in the ordinary course of its business.

81.     Defendant misappropriated Plaintiff's Trade Secrets within the meaning of the DTSA by acquiring such Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use, and thereafter using and/or disclosing such Trade Secrets without Plaintiff's consent and in breach of that duty.

82.     Defendant used Plaintiff's Trade Secrets for purposes beyond evaluating a potential transaction, including to develop, advance, and/or commercialize a competing FAST streaming platform, and to structure their business strategy, programming, monetization approach, and industry relationships in a manner derived from Plaintiff's proprietary information.

83.     Plaintiff developed and owned proprietary, non-public trade secrets relating to the design, launch, and operation of a Sports Illustrated-branded FAST streaming platform (the "Platform"), including, without limitation:

  a.  A multi-layered FAST distribution architecture specifying a coordinated rollout across (i) smart-TV OEM ecosystems, (ii) FAST aggregators, and (iii) virtual MVPD platforms, including the sequencing of launch partners, prioritization of non-exclusive carriage, and rapid audience aggregation strategy;

b. A hybrid programming model combining (i) editorial talent-driven shows, (ii) archive-based "vault" monetization, (iii) documentary and original content, and (iv) selective tier-2 and tier-3 live sports rights, designed to maximize engagement while minimizing rights acquisition costs;

c. A content sourcing and curation framework identifying specific categories of programming (including women's sports, high school sports, shoulder programming, and archive exploitation) and the relative allocation of airtime and production resources among those categories;

d. A monetization model integrating advertising inventory expansion, betting-related content and affiliate strategies, and cross-platform audience conversion mechanics;

e. A technology and operations framework leveraging existing internal assets, including editorial IP, content libraries, video infrastructure, and AI-enabled clipping and personalization tools, to create a capital-efficient FAST platform;

f. A go-to-market and distribution partner strategy, including identification of specific platforms and categories of partners, as well as the structure of distribution agreements and revenue generation through ad-supported streaming; and

g. A sequenced execution roadmap for building, launching, and scaling the Platform, including development priorities, partnership strategy, and operational integration.

84. Defendant's conduct reflects not merely the use of general industry concepts, but the appropriation of Plaintiff's specific combination, sequencing, and integration of strategic elements, as disclosed to Defendant in confidence.

85. Defendant's misappropriation was willful and malicious, as Defendant knowingly used the negotiation process to obtain Plaintiff's Trade Secrets and thereafter exploited such information for their own benefit.

86. Defendant's conduct involves trade secrets related to a product or service used in, or intended for use in, interstate commerce, including digital streaming platforms, advertising markets, and multi-state distribution channels.

17

87.    As a direct and proximate result of Defendant's misappropriation, Plaintiff has suffered damages, including but not limited to actual losses, loss of competitive advantage, and unjust enrichment to Defendant, in an amount to be determined at trial. Plaintiff is also entitled to recover exemplary damages and attorneys' fees to the extent permitted by law.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (Declaratory Judgment – Existence of Joint Venture)

88.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

89.    An actual and justiciable controversy exists between Plaintiff and Defendant as to whether a joint venture was formed between the parties in connection with the development and operation of a Sports Illustrated-branded FAST streaming platform.

90.    Under New York law, a joint venture exists where there is: (i) an agreement between the parties manifesting their intent to be associated as joint venturers; (ii) a contribution by each party of property, financial resources, effort, skill, or knowledge; (iii) a degree of joint control over the venture; and (iv) a provision for the sharing of profits and losses.

91.    Here, the parties agreed to form a joint venture, as evidenced by their negotiations, draft agreements, and course of conduct, including agreement on the structure of the venture, allocation of roles and responsibilities, and mutual contributions to the business.

92.    Plaintiff contributed substantial expertise, business strategy, industry relationships, and efforts in furtherance of the venture, while Defendant contributed intellectual property, brand rights, and platform resources.

93.    The parties exercised joint control over key aspects of the proposed venture, including development of business plans, investor outreach, and strategic direction.

94.    The parties also contemplated the sharing of profits and losses in connection with

the venture, as reflected in draft agreements and negotiations.

95.     Despite these facts, Defendant has wrongfully denied the existence of the joint venture and excluded Plaintiff from the business.

96.     Accordingly, Plaintiff seeks a declaration that a joint venture existed between the parties and that Defendant owes Plaintiff the duties arising therefrom, including fiduciary duties.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

97.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

98.     The NDA and the parties' related agreements and course of dealings constitute valid and enforceable contracts between Plaintiff and Defendant.

99.      Under New York law, every contract includes an implied covenant of good faith and fair dealing, which requires that neither party act in a manner that would deprive the other of the fruits of the contract.

100.    Plaintiff fully performed its obligations under the parties' agreements, including by disclosing Confidential Information, engaging in negotiations, and devoting substantial time, effort, and resources in furtherance of the contemplated transaction.

101.    Defendant breached the implied covenant of good faith and fair dealing by acting in bad faith and engaging in conduct that, while potentially not expressly prohibited by the letter of the agreements, violated their spirit and purpose.

102.    Specifically, Defendant used the contractual relationship and negotiation process as a pretext to obtain Plaintiff's Confidential Information and proprietary business strategies, while lacking any genuine intent to consummate the contemplated transaction, and thereafter used such information to advance their own competing business.

103.    Defendant's conduct had the effect of depriving Plaintiff of the benefits of the parties' agreements, including the opportunity to participate in the contemplated joint venture, to protect and control its Confidential Information, and to realize the value of its proprietary work product.

104.    As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages, including but not limited to loss of business opportunity, loss of the value of its Confidential Information, and unjust enrichment to Defendant, in an amount to be determined at trial.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(Unjust Enrichment)**

105.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

106.    Defendant was enriched at Plaintiff's expense by obtaining and using Plaintiff's proprietary information, business strategies, industry relationships, and substantial work product developed in connection with the contemplated FAST streaming venture.

107.    Plaintiff conferred a direct and measurable benefit upon Defendant by, among other things, providing detailed business plans, programming frameworks, monetization models, investor introductions, and strategic guidance, all of which were developed through Plaintiff's significant time, effort, expertise, and expense.

108.    Defendant knowingly accepted and retained these benefits under circumstances in which they understood that such information, work product, and relationships were being provided for the limited purpose of pursuing a joint venture with Plaintiff, and not for Defendant's independent use or commercial exploitation.

109.    Defendant nevertheless retained and used Plaintiff's proprietary information and

work product for their own benefit, including to develop, advance, and/or commercialize a competing FAST streaming platform, without compensating Plaintiff and without providing Plaintiff any participation in the resulting business.

110.    Under principles of equity and good conscience, Defendant should not be permitted to retain the benefits of Plaintiff's labor, skill, expenditures, and proprietary information without providing just compensation, particularly where such benefits were obtained through the parties' relationship and in reliance on Defendant's representations and agreements.

111.    As a direct and proximate result of Defendant's unjust enrichment, Plaintiff has suffered damages, including the value of the benefits conferred upon Defendant and the profits derived therefrom, in an amount to be determined at trial.

## DEMAND FOR TRIAL BY JURY

112.    Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the Defendant as follows:

A. For an award of damages, together with pre- and post-judgment interest thereon, in an amount to be determined at trial;

B. For an award of attorneys' fees as permitted by law, together with the costs and disbursement of this action; and

C. For such other and further relief, and whether of an equitable or legal nature, which the Court deems necessary and proper under the circumstances.

Dated: New York, New York
      April 14, 2026

Respectfully submitted,

**LEVIN-EPSTEIN & ASSOCIATES, P.C.**

By:  /s/ Joshua D. Levin-Epstein
      Joshua Levin-Epstein, Esq.
      Jason Mizrahi, Esq.
      420 Lexington Avenue, Suite 2458
      New York, NY 10170
      Tel. No.: (212) 792-0046
      Email: Joshua@levinepstein.com
      *Attorneys for the Plaintiff*