**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X

FusionMedia Ventures, LLC, Beusse and Frank, LLC, Thomas Beusse, and Neal Frank,

*Plaintiffs*,

- *against* -

Sportority Inc. d/b/a Minute Media,

*Defendant*.

-----------------------------------------------------------X

Case No.: 26-cv-03039

**FIRST AMENDED COMPLAINT**

Jury Trial Demanded

FusionMedia Ventures, LLC ("FusionMedia"), Beusse and Frank, LLC ("B&F LLC"), Thomas Beusse ("Beusse"), and Neal Frank ("Frank", and collectively with FusionMedia, B&F LLC, Beusse, the "Plaintiffs"), by their undersigned attorneys, as and for their complaint against Defendant Sportority Inc. d/b/a Minute Media ("Defendant" or "Minute Media"), complains as follows:

## PRELIMINARY STATEMENT

1. On May 1, 2024, Minute Media entered into a Mutual Nondisclosure Agreement (the "NDA") with Beusse and Frank, LLC, which the NDA identified as a Connecticut limited liability company and which the original Complaint alleged was the name under which FusionMedia conducted business in connection with the contemplated venture. Although Beusse and Frank, LLC had not yet been formally organized, the NDA bears three signatures: one by Chad Payne, Senior Vice President of Legal and Business Affairs, on behalf of Sportority Inc. d/b/a Minute Media, and two by Thomas Beusse, as Managing Member, on behalf of Beusse and Frank, LLC, demonstrating the parties' mutual assent and intent to be bound by the NDA's confidentiality and use restrictions. Following the filing of the original Complaint, Beusse and

Frank, LLC was formally organized, and adopted and ratified the NDA.

2. Subsequently, the parties exchanged and revised an unsigned draft LOI concerning a proposed joint venture. Later drafts identified FusionMedia as Minute Media's proposed counterparty. The LOI proposed an eventual 51% ownership interest for Minute Media and 49% for FusionMedia, subject to financing, valuation, and definitive documentation. It contemplated that FusionMedia would manage day-to-day operations and that Minute Media would contribute specified brand, content, technology, advertising, studio, and marketing resources.

3. The November 7, 2024 marked-up draft of the LOI identified confidentiality, exclusive negotiation, and non-circumvention provisions as provisions intended to be binding upon execution. Plaintiffs allege, in the alternative, that the parties assented to certain limited obligations through their communications and conduct.

4. The LOI provided, in relevant part, as follows:

> [redacted]

> [redacted]

[redacted]

Ex. B, LOI §§ 6.1–6.2, at 6 (emphasis added).

5. After 13 months of collaboration, an executed NDA, and the negotiation of a finalized LOI, Minute Media President Rich Routman, on June 13, 2025, abruptly ended the relationship by sending FusionMedia a cursory break-up email.

6. Since filing the original Complaint, Plaintiffs have discovered that, during the parties' relationship, Minute Media was also engaging with Plaintiffs' competitors concerning potential partnerships to develop the Sports Illustrated FAST channel. Ultimately, Minute Media launched the Sports Illustrated FAST channel through a joint venture with one of Plaintiff's competitors.

7. Plaintiff would not have negotiated the Letter of Intent containing detailed exclusivity and non-circumvention provisions, devoted more than a year to developing the venture, or provided Minute Media with extensive confidential and proprietary work product had it known that Minute Media was simultaneously exploring comparable arrangements with competing potential partners.

8. Having established that Plaintiffs have standing to pursue these claims, Plaintiffs attach certain representative examples of the valuable confidential and proprietary work product they provided to Minute Media, which contain and reflect Plaintiffs' protectable trade secrets. Exhibits G through H demonstrate that the information provided to Minute Media was valuable and proprietary work product that constitutes trade secrets. For example, Exhibit C contains a detailed Sports Illustrated FAST/OTT platform presentation addressing the proposed programming mix, live-sports integration, interactive features, distribution platforms, capital

requirements, revenue model, advertising strategy, and identified commercial partners. Exhibit D provides FusionMedia's confidential proposal detailing its proprietary approach to identifying, evaluating, acquiring, monetizing, and operating a FAST-streaming business for Minute Media, including target selection criteria, technical diligence, and integration strategies. Exhibit E contains FusionMedia's confidential analysis recommending an acquisition target for Minute Media, including its assessment of the asset, proposed advertising strategy, and preliminary valuation—commercial information FusionMedia claims as proprietary. Exhibit F is a confidential June 3, 2024 executive summary prepared for Minute Media that sets out B&F LLC's proposed Sports Illustrated FAST channel strategy, including specific plans for programming, rights acquisition, distribution, advertising, partnerships, and audience growth. Exhibit G is FusionMedia's confidential December 3, 2024 follow-up setting out a proposed programming mix, development pipeline, rights acquisition strategy, operating structure, and fundraising approach for the Sports Illustrated FAST venture. Exhibit H is a draft SI TV investor deck outline containing proposed programming, distribution, audience conversion, monetization, and capital-raising plans that reveal potentially confidential details of the venture's business strategy.

9. In addition, Plaintiffs provided Minute Media with summaries and conclusions derived from complex financial models, including the models' proprietary output data, all of which were developed through Plaintiffs' independent professional judgment and analysis.

10. After stringing Plaintiffs along for more than a year—repeatedly soliciting and accepting additional confidential work product before abruptly terminating the relationship—Minute Media proceeded without Plaintiffs and, working with competing third-party partners, ultimately launched SI TV as a free, 24/7 Sports Illustrated-branded FAST channel. Upon its launch, SI TV's publicly disclosed programming, distribution, monetization, archival-content,

women's-sports, emerging-sports, and live-event strategies made clear that Minute Media had implemented and used substantial portions of the integrated confidential blueprint and work product Plaintiffs had provided.

11. Accordingly, this action does not arise from a merely unsuccessful business negotiation, but from Minute Media's deliberate solicitation, receipt, and alleged misuse of Plaintiffs' valuable confidential work product and trade secrets while secretly pursuing a substantially similar venture with a competing partner.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

13. The trade secrets at issue relate to products and services used in, or intended for use in, interstate commerce, including digital streaming platforms, advertising markets, and multi-state distribution channels, thereby satisfying the jurisdictional requirements of the Defend Trade Secrets Act.

14. This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendant resides in this District and maintains their principal place of business here.

**THE PARTIES**

16. FusionMedia is a limited liability company organized under the laws of the State

of Connecticut on August 27, 2024, with its principal place of business in Norwalk, Connecticut. FusionMedia is comprised of two members, Beusse and Frank, who are both citizens of the State of Connecticut.

17. B&F LLC is a limited liability company organized under the laws of the State of Connecticut on July 18, 2026, with its principal place of business in Connecticut. Its members, Thomas Beusse and Neal Frank, are both citizens of Connecticut.

18. FusionMedia and B&F LLC maintained their principal places of business in Connecticut, at the relevant times.

19. Plaintiff Thomas Beusse is a natural person who, at all times relevant to this action, was domiciled in and a citizen of the State of Connecticut. Beusse is a seasoned senior executive in the sports media industry with decades of experience leading major multi-platform media organizations, including USA Today Sports, Sports Illustrated, and Westwood One. He has served as CEO of multiple media companies, secured significant private equity funding, and is a pioneer in FAST channel development, including launching the World Surf League's streaming platform and advising on emerging sports streaming initiatives.

20. Plaintiff Neal Frank is a natural person who, at all times relevant to this action, was domiciled in and a citizen of the State of Connecticut. Frank is an accomplished media and ad-tech executive with extensive experience building and scaling digital media ventures. He has founded and led multiple successful companies, including The Marlin Entertainment Group and The Design Network, a leading FAST channel, and has held senior roles developing innovative monetization and ad-tech solutions, including managing over $100 million in invested capital and contributing to the global expansion of MTV.

21. At all relevant times, the Plaintiff maintained a principal place of business in the

State of Connecticut.

22. At all times relevant herein, Defendant Sportority Inc. d/b/a Minute Media is a Delaware corporation with its principal place of business in New York, New York.

23. Minute Media controls or licenses certain rights associated with the Sports Illustrated brand and represented that it possessed the intellectual-property rights, content, technology, advertising capabilities, distribution infrastructure, and other assets necessary to participate in the contemplated Sports Illustrated FAST venture.

**FACTUAL COMMON TO ALL CLAIMS FOR RELIEF**

**A. Ownership and Basis for Asserting Claims**

24. As explained in detail below, Plaintiffs have standing to assert the claims arising from the NDA, the LOI, and Defendant's unauthorized use of Plaintiffs' confidential information and trade secrets.

**(i) The NDA and Preformation Work Product**

25. On May 1, 2024, Minute Media and B&F LLC entered into the NDA.

26. Although B&F LLC had not yet been formally organized, Minute Media knew it was dealing with Beusse and Frank, negotiated directly with them, accepted their performance, and repeatedly requested and received their confidential work product under the NDA.

27. B&F LLC was organized in Connecticut on July 18, 2026, after the filing of the original Complaint.

28. After its organization, B&F LLC adopted and ratified the May 1, 2024 NDA and received the rights Beusse and Frank assigned to it.

29. B&F LLC asserts the NDA claim as the named contracting entity following ratification and assignment. Beusse and Frank plead their own rights in the alternative if B&F

LLC cannot enforce rights arising before formation. Plaintiffs seek only one recovery for any single injury.

30. Alternatively, Beusse and Frank allege that they personally supplied and owned the preformation information at issue and performed the acts attributed to B&F LLC. Their independent right to enforce the NDA, if any, depends on the facts of execution, performance, and applicable preformation-contract law.

31. Minute Media understood that Beusse and Frank were the persons performing under the NDA and providing the protected information, accepted the benefits of their performance, and treated the NDA as binding throughout the parties' relationship.

32. At a minimum, Beusse independently possesses the right to enforce the NDA because he executed it on behalf of the then-unformed entity and personally performed under it.

33. B&F LLC and, alternatively, Beusse and Frank assert rights under the NDA and to preformation work product only to the extent established by ownership and the documented chain of assignment. FusionMedia asserts rights in work it created or otherwise acquired after its formation.

**(ii) FusionMedia Has Standing to Assert Claims Under the LOI and Other Claims**

34. FusionMedia was organized as a Connecticut limited liability company on August 27, 2024.

35. The LOI expressly identifies FusionMedia and Sportority Inc. d/b/a Minute Media as the intended parties to the contemplated Sports Illustrated FAST joint venture.

36. The LOI defines FusionMedia as "FM" and Minute Media as "MM" and refers to them collectively as the "parties."

37. The LOI's signature page likewise identifies FusionMedia as Minute Media's

counterparty and provides signature lines for Thomas Beusse and Neal Frank solely in their representative capacities as FusionMedia's managing members.

38. Minute Media's November 7, 2024 revisions to the LOI continued to identify FusionMedia—not B&F LLC, Beusse, or Frank individually—as the proposed joint-venture counterparty.

39. The LOI set forth the parties' negotiated framework concerning ownership, contributions, management, governance, funding, profit-and-loss allocation, confidentiality, exclusive negotiations, noncompetition, and non-circumvention.

40. After FusionMedia's formation and throughout the parties' continuing relationship, Minute Media dealt directly with FusionMedia, requested that FusionMedia perform work in furtherance of the contemplated venture, and accepted the resulting confidential and proprietary work product.

41. Accordingly, FusionMedia asserts the claims arising from its own alleged work, property, and any independently enforceable agreement with Minute Media.

**B. Timeline of the Parties' Business Relationship**

42. In 2024, Beusse and Frank approached Minute Media to obtain a content license independently for Minute Media's Sports Illustrated related content, without any partnership.

43. Shortly thereafter, the parties pivoted to discussions of a potential collaboration for a joint venture.

44. On May 1, 2024, B&F LLC and Minute Media entered into the NDA that stated that the parties contemplated a jointly owned venture to operate the FAST-programming service.

45. In August 2024, FusionMedia and Minute Media progressed their business relationship toward negotiating and structuring a joint venture agreement for the development and

operation of the Fast-programming service through the LOI.

46. From mid-2024 through late 2024, Plaintiffs continued to provide Minute Media with confidential proprietary strategies, including: (a) programming strategies and content pipelines; (b) platform architecture and monetization concepts; and (c) strategic partnerships and market positioning.

**C. Minute Media's Misconduct and Unauthorized Use of Plaintiffs' Confidential Work Product**

47. On or about July 10, 2025, Plaintiffs, through counsel, notified Defendant of its breaches of the NDA, LOI, and related misconduct.

48. Defendant breached the NDA, misappropriated confidential information, and were unjustly enriched by inducing Plaintiff to share proprietary information through false representations of a partnership, then using that information to develop the FAST-programming service without Plaintiff.

49. Before and after entering into the NDA, Defendant deliberately made material misrepresentations to induce Plaintiffs to disclose its Confidential Information (as defined in the NDA), including falsely representing on multiple occasions that the parties were, and would be, partners in connection with the FAST-programming service.

50. Although the LOI was not ultimately executed, it reflects the parties' mutual understanding, course of dealing, and agreement in principle to form a joint venture to develop and operate a Sports Illustrated-branded FAST streaming platform.

51. Under the terms of the LOI, the parties agreed to collaborate in good faith toward a definitive joint venture agreement, including jointly developing an investor presentation, raising capital, and structuring the business, with defined roles for each party, including Plaintiff's responsibility for operations and capital formation and Defendant's contribution of intellectual

property and platform assets.

52. In addition, the LOI expressly contemplated an exclusive negotiation period, pursuant to which the parties agreed to negotiate solely with one another in good faith with respect to the development of the venture and not to pursue competing arrangements during that period.

53. Further, the LOI included binding provisions governing, *inter alia*, confidentiality, non-circumvention, and exclusivity, which were intended to protect the parties' respective contributions, proprietary information, and business opportunity during the negotiation and development process.

54. Defendant breached their obligations by using the negotiation process to extract Plaintiff's proprietary information, failing to negotiate in good faith, violating exclusivity by pursuing the same business independently, exploiting Plaintiff's work and relationships, and terminating discussions after capturing the value of Plaintiff's efforts.

### D. Defendant's Misappropriation of Plaintiff's Proprietary Work Product and Trade Secrets

55. Defendant misappropriated Plaintiffs' proprietary business concepts, trade secrets, strategic frameworks, and non-public operational methodologies developed in connection with the parties' contemplated FAST platform.

56. A representative compilation of Plaintiffs' work product is attached hereto as Exhibit C through H.

57. Set forth below is a chart of the ownership of the work product to the corresponding exhibits.

| **Exhibit No.** | **Date Provided to Defendant** | **The Name of the Plaintiff Asserting Rights and Claim** |
|---|---|---|
| Exhibit C | September 11, 2024 | FusionMedia |

| | | |
|---|---|---|
| Exhibit D | January 17, 2025 | FusionMedia |
| Exhibit E | March 2025 | FusionMedia |
| Exhibit F | June 2024 | B&F LLC assigned its rights to FusionMedia |
| Exhibit G | December 2024 | FusionMedia |
| Exhibit H | September 2024 | FusionMedia |

58. The work product was not limited to generalized industry ideas, but instead reflected a specific and differentiated architecture for launching and scaling a Sports Illustrated-branded streaming television platform, including the integration of content, distribution, monetization, and technology into a unified model.

59. Plaintiffs developed and disclosed a brand-led FAST platform strategy that extended the Sports Illustrated franchise beyond traditional publishing into a comprehensive streaming ecosystem combining live sports, editorial programming, archival content, and interactive features.

60. Defendant subsequently launched a FAST channel that mirrors this same core concept – namely, a 24/7 Sports Illustrated-branded streaming platform built around original programming, live events, lifestyle content, and archival footage – reflecting direct adoption of Plaintiff's strategic vision.

61. Defendant further misappropriated Plaintiffs' content strategy and programming architecture, which called for a hybrid model combining: (i) editorial talent-driven programming, (ii) original and documentary content, (iii) archival "vault" monetization, and (iv) selective tier-2 and tier-3 live sports rights as a capital-efficient alternative to premium league rights.

62. The FAST channel ultimately launched by Defendant follows this same multi-

layered programming structure, including the use of editorial franchises, archive-based programming, and limited live sports inventory, demonstrating substantial overlap with Plaintiffs' proprietary framework.

63. In addition, Defendant appropriated Plaintiffs' distribution strategy, which emphasized rapid audience aggregation through broad, non-exclusive distribution across multiple FAST platforms, smart-TV ecosystems, rather than reliance on a single destination platform.

64. Consistent with Plaintiffs' model, Defendant launched the channel across numerous third-party streaming platforms and aggregators, including several identical or functionally equivalent distribution partners, thereby implementing the same layered distribution architecture developed and disclosed by Plaintiff.

65. Defendant also misused Plaintiffs' monetization and engagement framework, which incorporated sports betting content, interactive features, and data-driven engagement tools as key drivers of audience growth and advertising revenue. The publicly available version of Defendant's platform similarly integrates betting-related content and engagement-driven programming, reflecting further alignment with Plaintiffs' proprietary strategy.

66. Critically, Plaintiffs' work emphasized leveraging existing internal assets – such as editorial talent, content libraries, and technology infrastructure – to build a capital-efficient FAST platform. Defendant's ultimate implementation adopts this same approach, relying heavily on Sports Illustrated editorial content, archives, and Minute Media's existing technology stack, rather than developing a platform from first principles.

67. The overlap between Plaintiffs' work product and Defendant's launched platform is not incidental or limited to generalized industry trends. Rather, it reflects the specific combination, sequencing, and integration of strategic elements uniquely developed by Plaintiffs

and disclosed to Defendant under the protection of the parties' non-disclosure agreement. Defendant's use of these elements to develop and launch their FAST platform constitutes misappropriation of Plaintiff's confidential and proprietary information.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Breach of Contract - NDA)**
**(Thomas Beusse, Neal Frank, and Beusse and Frank, LLC as against Minute Media)**

68. Plaintiffs Beusse, Frank, and B&F LLC repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

69. The NDA constitutes a valid and enforceable contract.

70. Under the NDA, Defendant agreed, *inter alia*, to maintain the confidentiality of Confidential Information (as defined in the NDA), to use such information solely for the limited purpose of evaluating a potential business transaction between the parties, and not to disclose or use such information for any other purpose.

71. The above-named plaintiffs fully performed their obligations under the NDA, including by disclosing Confidential Information to Defendant in reliance on Defendant's contractual commitments and by otherwise complying with all conditions precedent.

72. Defendant materially breached the NDA by, among other things, using the Confidential Information for purposes beyond evaluating a potential transaction, including: to develop, advance, and/or commercialize a competing FAST streaming platform; incorporating Plaintiff's proprietary business strategies, programming frameworks, monetization models, and industry relationships into their own business activities; disclosing or leveraging such Confidential Information outside the limited "need-to-know" scope permitted by the NDA; and failing to maintain such information in strict confidence as required by the NDA.

73. As a direct and proximate result of Defendant's breaches, the above-named

plaintiffs have suffered substantial damages, including but not limited to the loss of business opportunities, loss of the benefit of its proprietary information, competitive harm, and unjust enrichment to Defendant, in an amount to be determined at trial.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Breach of Type II Preliminary Agreement; in the Alternative, Implied-in-Fact Contract)**
**(FusionMedia as Against Minute Media)**

74. Plaintiff FusionMedia repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

75. Through their communications, negotiations, and course of performance, FusionMedia and Minute Media negotiated and finalized a preliminary agreement pursuant to which they committed to negotiate in good faith toward a definitive agreement for the formation, financing, launch, and operation of a Sports Illustrated-branded FAST streaming platform.

76. The framework of the parties' preliminary agreement was memorialized in the detailed draft Letter of Intent negotiated by FusionMedia and Minute Media over several months. The LOI identified FusionMedia and Minute Media as the parties and set forth the principal terms of their proposed venture, including their respective ownership interests, contributions, management responsibilities, governance rights, funding obligations, allocation of profits and losses, confidentiality protections, exclusive-negotiation framework, and protections against competition and circumvention.

77. Under the negotiated framework, Minute Media would contribute access to and rights associated with the Sports Illustrated brand, content libraries, technology, advertising capabilities, production resources, marketing support, and related industry relationships. FusionMedia would contribute its FAST-industry expertise, business and programming strategies, operational services, capital-raising efforts, acquisition analyses, partnership development,

investor materials, and confidential and proprietary work product.

78. Although the parties anticipated executing a definitive joint-venture agreement and the LOI provided that certain provisions would become binding upon execution, the parties' words, conduct, and performance independently manifested their agreement to negotiate the contemplated transaction in good faith within the framework they had established.

79. Minute Media repeatedly represented that it intended to pursue the Sports Illustrated FAST venture with FusionMedia, directed FusionMedia to continue developing the venture, requested additional analyses and deliverables, reviewed and provided feedback concerning FusionMedia's work, and accepted the benefits of FusionMedia's continued performance.

80. In reliance on that commitment, FusionMedia devoted substantial time, resources, and industry expertise to the contemplated venture and provided Minute Media with confidential business plans, programming strategies, acquisition evaluations, financial analyses, monetization models, investor materials, potential-partner information, and other proprietary work product, including the representative materials annexed hereto.

81. For months after the parties negotiated the principal terms reflected in the LOI, Minute Media continued requesting and accepting FusionMedia's performance without disclosing that it was simultaneously communicating or negotiating with FusionMedia's competitors concerning the same or a substantially similar Sports Illustrated FAST venture.

82. Minute Media breached its obligation to negotiate in good faith by, among other things: secretly pursuing competing arrangements inconsistent with the parties' agreed framework; continuing to solicit and accept FusionMedia's confidential work product while withholding its competing negotiations; using the negotiation process to obtain the benefit of

FusionMedia's services and proprietary information; circumventing FusionMedia to pursue substantially the same opportunity with a competing partner; and terminating negotiations after obtaining the benefit of FusionMedia's performance.

83. Minute Media's conduct was inconsistent with the agreed framework and demonstrated that it used the parties' negotiations to advance the contemplated venture without FusionMedia rather than making a good-faith effort to reach a definitive agreement with FusionMedia.

84. Minute Media subsequently proceeded with a competing partner and launched SI TV using a programming, distribution, monetization, content-acquisition, and implementation strategy that substantially corresponded to the integrated confidential framework FusionMedia had developed and disclosed during the parties' negotiations.

85. In the alternative, if the Court determines that the parties did not enter into an enforceable Type II agreement, their communications, conduct, and course of performance created an implied-in-fact contract under which FusionMedia agreed to provide services and proprietary work product for the development of the contemplated venture, and Minute Media agreed to accept that performance solely in furtherance of the parties' contemplated transaction and not to use it to circumvent FusionMedia or pursue substantially the same venture with a competing partner.

86. FusionMedia performed its obligations under the implied-in-fact contract by providing the requested services, expertise, analyses, strategies, introductions, and proprietary work product, which Minute Media knowingly requested, received, reviewed, and accepted.

87. Minute Media breached the implied-in-fact contract by retaining and using the benefits of FusionMedia's performance, excluding FusionMedia from the resulting venture, and

implementing FusionMedia's confidential work product through SI TV and related initiatives without FusionMedia's authorization or compensation.

88. As a direct and proximate result of Defendant's breach of their obligation to negotiate in good faith, FusionMedia has suffered damages, including but not limited to out-of-pocket costs, lost business opportunities, loss of the benefit of its proprietary work, and unjust enrichment to Defendant, in an amount to be determined at trial.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Promissory Estoppel)**
**(Fusion Media as Against Minute Media)**

89. Plaintiff Fusion Media repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

90. In the alternative to contract recovery, FusionMedia alleges that Minute Media made specific assurances that it would continue to develop the proposed venture with FusionMedia and requested additional work in reliance on those assurances.

91. Defendant made clear and unambiguous promises to Fusion Media that the parties would enter into a joint venture to develop and operate a Sports Illustrated-branded FAST streaming platform, and that Fusion Media would serve as a partner, operator, and equity participant in that venture. These promises were made repeatedly, during the course of negotiations, including in meetings, calls, written communications, and draft deal documents, and were intended to induce FusionMedia's participation and disclosure of proprietary information.

92. Defendant's promises were reasonably expected to induce reliance by Fusion Media, and Defendant knew or should have known that FusionMedia would rely on those promises by devoting substantial time, resources, and expertise to the development of the contemplated venture, including preparing business plans, developing programming and

monetization strategies, and making introductions to investors and industry partners.

93. FusionMedia did, in fact, reasonably and foreseeably rely on Defendant's promises by, among other things, expending significant time and resources over an extended period, disclosing valuable Confidential Information, developing joint materials, and foregoing other business opportunities in order to advance the contemplated joint venture with Defendant.

94. Defendant failed to honor its promises and instead used the negotiation process as a pretext to obtain FusionMedia's proprietary information and business insights, after which Defendant terminated negotiations and proceeded to develop and pursue the same or a substantially similar opportunity without FusionMedia.

95. During an in-person meeting in New York City, Minute Media President Richard Routman expressly told Beusse that Minute Media and FusionMedia "are partners."

96. Consistent with that representation, Minute Media directed FusionMedia to continue developing the venture, requested additional analyses and deliverables, reviewed and provided feedback concerning FusionMedia's work, and accepted the benefits of FusionMedia's continued performance.

97. As a direct and proximate result of Defendant's failure to honor their promises, FusionMedia has suffered substantial injury, including but not limited to out-of-pocket costs, loss of business opportunities, loss of the value of its proprietary work and information, and unjust enrichment to Defendant, in an amount to be determined at trial.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Misappropriation of Trade Secrets – Defend Trade Secrets Act, 18 U.S.C. § 1836)**
**(Plaintiffs as Against Minute Media)**

98. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

99. Plaintiffs developed and owned valuable trade secrets within the meaning of the Defend Trade Secrets Act, including specific, non-public, and proprietary information relating to the development and operation of a FAST streaming platform (the "Trade Secrets").

100. The Trade Secrets include, without limitation: (i) detailed programming strategies, including specific content mix and scheduling frameworks; (ii) proprietary monetization models, including structured advertising, sponsorship, and revenue optimization strategies; (iii) a curated investor pipeline and capital formation strategy; (iv) identified business relationships and introductions to potential partners, distributors, and advertisers; (v) strategic plans for platform development, launch, and distribution across connected TV ecosystems; and (vi) integrated business models combining content, advertising, and audience engagement.

101. Plaintiffs have annexed as exhibits representative examples of the confidential and proprietary work product they disclosed to Minute Media during the parties' relationship. These exhibits are illustrative, rather than exhaustive, of the trade secrets Minute Media received from Plaintiffs.

102. The representative materials include Plaintiffs' confidential Sports Illustrated FAST-platform strategy, programming architecture, distribution model, financial and monetization analyses, acquisition evaluation, investor strategy, operational roadmap, market-entry plan, content strategy, and related business methods.

103. Plaintiffs also provided Minute Media with confidential summaries and conclusions derived from complex financial models, including proprietary inputs, assumptions, methodologies, and output data developed through Plaintiffs' independent professional judgment.

104. The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by, other persons or entities who could obtain

economic value from their disclosure or use. The information reflects Plaintiff's substantial time, effort, expertise, and industry experience, and provides a competitive advantage in the rapidly evolving FAST streaming market.

105. Plaintiff took reasonable measures to maintain the secrecy of its Trade Secrets, including, *inter alia*, entering into the NDA with Defendant, limiting disclosure of such information to confidential settings, restricting dissemination on a need-to-know basis, and treating such information as confidential and proprietary in the ordinary course of its business.

106. Defendant misappropriated Plaintiff's Trade Secrets within the meaning of the DTSA by acquiring such Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use, and thereafter using and/or disclosing such Trade Secrets without Plaintiff's consent and in breach of that duty.

107. Defendant used Plaintiff's Trade Secrets for purposes beyond evaluating a potential transaction, including to develop, advance, and/or commercialize a competing FAST streaming platform, and to structure their business strategy, programming, monetization approach, and industry relationships in a manner derived from Plaintiff's proprietary information.

108. Plaintiff developed and owned proprietary, non-public trade secrets relating to the design, launch, and operation of a Sports Illustrated-branded FAST streaming platform (the "Platform"), including, without limitation:

a. A multi-layered FAST distribution architecture specifying a coordinated rollout across (i) smart-TV OEM ecosystems, (ii) FAST aggregators, and (iii) virtual MVPD platforms, including the sequencing of launch partners, prioritization of non-exclusive carriage, and rapid audience aggregation strategy;

b. A hybrid programming model combining (i) editorial talent-driven shows, (ii) archive-based "vault" monetization, (iii) documentary and original content, and (iv) selective tier-2 and tier-3 live sports rights, designed to maximize engagement while minimizing rights acquisition costs;

c. A content sourcing and curation framework identifying specific categories of programming (including women's sports, high school sports, shoulder programming, and archive exploitation) and the relative allocation of airtime and production resources among those categories;

d. A monetization model integrating advertising inventory expansion, betting-related content and affiliate strategies, and cross-platform audience conversion mechanics;

e. A technology and operations framework leveraging existing internal assets, including editorial IP, content libraries, video infrastructure, and AI-enabled clipping and personalization tools, to create a capital-efficient FAST platform;

f. A go-to-market and distribution partner strategy, including identification of specific platforms and categories of partners, as well as the structure of distribution agreements and revenue generation through ad-supported streaming; and

g. A sequenced execution roadmap for building, launching, and scaling the Platform, including development priorities, partnership strategy, and operational integration.

109. Defendant's conduct reflects not merely the use of general industry concepts, but the appropriation of Plaintiff's specific combination, sequencing, and integration of strategic elements, as disclosed to Defendant in confidence.

110. Defendant's misappropriation was willful and malicious, as Defendant knowingly used the negotiation process to obtain Plaintiff's Trade Secrets and thereafter exploited such information for their own benefit.

111. Defendant's conduct involves trade secrets related to a product or service used in, or intended for use in, interstate commerce, including digital streaming platforms, advertising markets, and multi-state distribution channels.

112. As a direct and proximate result of Defendant's misappropriation, Plaintiff has suffered damages, including but not limited to actual losses, loss of competitive advantage, and

unjust enrichment to Defendant, in an amount to be determined at trial. Plaintiff is also entitled to recover exemplary damages and attorneys' fees to the extent permitted by law.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Declaratory Judgment – Existence of Joint Venture)**
**(FusionMedia as Against Minute Media)**

113. Plaintiff FusionMedia repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

114. An actual and justiciable controversy exists between FusionMedia and Minute Media concerning the existence and scope of the parties' joint venture and their respective rights and obligations arising from their agreement and course of performance concerning the Sports Illustrated FAST platform.

115. By August 2024, FusionMedia and Minute Media had agreed upon the material terms of their joint undertaking, including their respective ownership interests, contributions, management responsibilities, governance rights, funding obligations, confidentiality obligations, and allocation of profits and losses.

116. The parties' agreement was memorialized in the detailed LOI, which identified FusionMedia and Minute Media as the parties to the contemplated joint venture and provided that Minute Media would initially own 51% and FusionMedia would initially own 49% of the venture.

117. The parties agreed to contribute complementary resources, expertise, property, and services. Minute Media would contribute access to and rights associated with the Sports Illustrated brand, content, technology, advertising capabilities, production resources, and industry relationships. FusionMedia would contribute its FAST-industry expertise, business and programming strategies, market knowledge, operational services, capital-raising efforts, partnership development, and confidential and proprietary work product.

118. The parties further agreed to exercise joint control over the undertaking. The LOI provided for a five-member governing board, with two members appointed by Minute Media, two members appointed by FusionMedia, and a mutually approved fifth member appointed by an additional investor group. Material decisions required supermajority approval.

119. The parties also agreed that the venture's profits and losses would be allocated in proportion to their respective ownership interests unless otherwise mutually agreed in writing.

120. The parties' intent to associate as joint venturers was demonstrated not only by the negotiated LOI but also by their subsequent course of performance. For approximately ten months after negotiating the LOI's material terms, FusionMedia and Minute Media continued working together to develop the Sports Illustrated FAST platform.

121. During that period, FusionMedia contributed substantial labor, expertise, confidential strategies, programming concepts, financial analyses, acquisition evaluations, investor materials, and other proprietary work product, including the representative materials annexed hereto.

122. A judicial declaration is therefore necessary to determine the parties' respective rights and obligations and to prevent Minute Media from continuing to exercise exclusive control over opportunities, assets, work product, revenues, and other benefits that FusionMedia alleges belong, in whole or in part, to the joint venture.

123. Pursuant to 28 U.S.C. §§ 2201 and 2202, FusionMedia respectfully requests a judgment declaring that:

a. FusionMedia and Minute Media formed a joint venture concerning the development and operation of the Sports Illustrated FAST platform;

b. FusionMedia holds a 49% interest in the joint venture, subject to any dilution or

modification established by the parties' agreement;

c. Minute Media may not appropriate for itself the joint venture's opportunities, assets, confidential work product, revenues, or other benefits to the exclusion of FusionMedia;

d. Minute Media must account to FusionMedia for all revenues, profits, opportunities, and benefits derived from the joint venture and the use of its assets and work product; and

e. FusionMedia is entitled to such further legal and equitable relief as is necessary to protect and enforce its rights in the joint venture.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**(All Plaintiffs as Against Minute Media)**

124. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

125. Defendant was enriched at Plaintiffs' expense by obtaining and using Plaintiffs' proprietary information, business strategies, industry relationships, and substantial work product developed in connection with the contemplated FAST streaming venture.

126. Plaintiffs conferred a direct and measurable benefit upon Defendant by, among other things, providing detailed business plans, programming frameworks, monetization models, investor introductions, and strategic guidance, all of which were developed through Plaintiffs' significant time, effort, expertise, and expense.

127. Defendant knowingly accepted and retained these benefits under circumstances in which they understood that such information, work product, and relationships were being provided for the limited purpose of pursuing a joint venture with Plaintiffs, and not for Defendant's independent use or commercial exploitation.

128. Defendant nevertheless retained and used Plaintiffs' proprietary information and

work product for their own benefit, including to develop, advance, and/or commercialize a competing FAST streaming platform, without compensating Plaintiffs and without providing Plaintiff any participation in the resulting business.

129. Under principles of equity and good conscience, Defendant should not be permitted to retain the benefits of Plaintiffs' labor, skill, expenditures, and proprietary information without providing just compensation, particularly where such benefits were obtained through the parties' relationship and in reliance on Defendant's representations and agreements.

130. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff has suffered damages, including the value of the benefits conferred upon Defendant and the profits derived therefrom, in an amount to be determined at trial.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**
**(FusionMedia as Against Minute Media)**

131. Plaintiff FusionMedia repeats and realleges each of the preceding allegations as though fully set forth herein.

132. This claim is pleaded in the alternative to the extent the Court determines that FusionMedia and Minute Media formed a joint venture through their agreement and subsequent course of performance concerning the development and operation of the Sports Illustrated FAST platform.

133. FusionMedia and Minute Media manifested their intent to associate as joint venturers by agreeing upon their respective ownership interests, contributions, management responsibilities, governance rights, funding obligations, and allocation of profits and losses.

134. The parties agreed that Minute Media would initially own 51% of the venture and FusionMedia would initially own 49%, and that the venture's profits and losses would be allocated

in proportion to those ownership interests unless otherwise mutually agreed in writing.

135. The parties further agreed to contribute complementary property, resources, effort, skill, and knowledge and to exercise joint control through a governing board on which FusionMedia and Minute Media would have equal representation, with material decisions requiring supermajority approval.

136. FusionMedia performed in furtherance of the joint venture by contributing substantial labor, expertise, confidential strategies, programming concepts, financial analyses, acquisition evaluations, investor materials, industry relationships, and other proprietary work product, including the representative materials annexed hereto.

137. Minute Media participated in the joint venture by directing and requesting FusionMedia's work, reviewing and accepting FusionMedia's deliverables, providing information and feedback, and contributing access to and authority concerning the Sports Illustrated brand, content, technology, production resources, advertising capabilities, and related assets.

138. As FusionMedia's coventurer, Minute Media owed FusionMedia fiduciary duties of loyalty, candor, disclosure, good faith, and fair dealing. Those duties included obligations not to secretly compete with or circumvent FusionMedia, appropriate opportunities or assets belonging to the joint venture, misuse FusionMedia's confidential contributions, or exclude FusionMedia from the benefits of the parties' undertaking.

139. Minute Media breached its fiduciary duties by, among other things:

a. secretly communicating and negotiating with FusionMedia's competitors concerning substantially similar Sports Illustrated FAST arrangements;

b. concealing those competing dealings while continuing to request and accept additional

confidential work product from FusionMedia;

c. using or retaining FusionMedia's confidential strategies, analyses, programming concepts, financial materials, and integrated business blueprint for purposes adverse to FusionMedia;

d. circumventing FusionMedia and appropriating for itself opportunities developed through the parties' joint undertaking;

e. terminating the parties' relationship after receiving more than a year of FusionMedia's performance;

f. excluding FusionMedia from the ownership, management, revenues, profits, and other benefits of the resulting Sports Illustrated FAST platform;

g. launching and operating SI TV through arrangements with competing third-party partners while implementing substantial portions of the confidential blueprint FusionMedia contributed to the joint venture; and

h. failing to disclose or account for the revenues, profits, opportunities, transactions, and other benefits derived from the joint venture and its assets.

140. As a direct and proximate result of Minute Media's breaches, FusionMedia has suffered damages, including the loss of its interest in the joint venture, the value of its uncompensated contributions, and its share of the revenues, profits, opportunities, and other benefits appropriated by Minute Media.

## DEMAND FOR TRIAL BY JURY

141. Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the Defendant as follows:

A. For an award of damages, together with pre- and post-judgment interest thereon, in an amount to be determined at trial;

B. For an award of attorneys' fees as permitted by law, together with the costs and disbursement of this action; and

C. For such other and further relief, and whether of an equitable or legal nature, which the Court deems necessary and proper under the circumstances.

Dated: New York, New York
September 29, 2026

Respectfully submitted,

**LEVIN-EPSTEIN & ASSOCIATES, P.C.**

By: /s/ *Joshua D. Levin-Epstein*
Joshua Levin-Epstein, Esq.
Jason Mizrahi, Esq.
420 Lexington Avenue, Suite 2458
New York, NY 10170
Tel. No.: (212) 792-0046
Email: Joshua@levinepstein.com
*Attorneys for the Plaintiff*